

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MICHAEL OAKES | § | |
| *Plaintiff* | § | |
| v. | § | |
| | § | |
| JUST ONE DIME COACHING, LLC, d/b/a | § | Case Number: |
| DONE FOR YOU BY JUST ONE DIME, d/b/a | § | 1:22-cv-1045 |
| VERITUS A SERIES OF EMBUE, LLC; DANILO | § | |
| VARRIALE; and TRAVIS S. KNIEP | § | |
| *Defendants* | § | |

## PLAINTIFF OAKES' ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff, Michael Oakes ("Plaintiff" or "Mr. Oakes"), by and through his undersigned counsel, files this Original Complaint against Defendants Just One Dime Coaching, LLC, d/b/a Done for You By Just One Dime, d/b/a Veritus a Series of Embue, LLC; Danilo Varriale, and Travis S. "Seth" Kniep (Defendants collectively referred to herein as "JOD" or "JOD Defendants") and alleges as follows:

### I.  THE PARTIES

1.     **Plaintiff Michael Oakes** is an individual residing in the state of Oregon.

2.     **Defendant Just One Dime Coaching, LLC, d/b/a Done for You By Just One Dime, d/b/a Veritus a Series of Embue, LLC** is a limited liability company

organized under the laws of the State of Texas.  Defendant's principal place of business is in Austin, Texas, in Travis County.  Its registered agent for service is Registered Agents, Inc., 5900 Balcones Drive, Suite 100, Austin, Texas, 78731.

3.      **Defendant Travis. S. Kniep** is an individual residing in Austin, Texas, in Travis County.  He may be served with process at his place of business, 8516 Anderson Mill Road, Suite 200, Austin, Texas, 78729.

4.      **Defendant Danilo Varriale** is an individual residing in Miramar, Florida, in Broward County.  He may be served with process at his place of business; 19573 SW 42nd Ct., Miramar, Florida 33029, or wherever he may be found.

## II. PERSONAL JURISDICTION

5.      This Court has personal jurisdiction over the corporate Defendants because they are organized and have a registered agent in Texas.

6.      Defendant Travis S. Kniep is a resident of Texas.

7.      Danilo Varriale is a resident of Florida who purposely availed himself of the laws and protections of the state of Texas by working full-time for a Texas company.

8.     Based on their general and specific contacts with the State of Texas, Defendants have personally availed themselves of the privilege of conducting activities within the State of Texas and have minimum contacts with the State of Texas.

9.     Additionally, Paragraph 14 of the Services Agreement Between Michael Oakes and Veritus ("the Services Agreement"), the contract that governs in this matter, provides, in part:

> Both parties agree that any litigation or arbitration between the parties will take place in Travis County, Tex.  The parties hereto consent to and waive any objection to personal jurisdiction or venue in any forum located in that county, the personal jurisdiction and the exclusive venue under this Agreement.

### III.     SUBJECT MATTER JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy is over $75,000.00. There is also complete diversity of citizenship between the parties.

11.     Furthermore, this Court has subject matter jurisdiction under 28 USC § 1331, as this case raises a federal question under the laws of the United States.

12.     Venue is proper in this district under 28 U.S.C. §1391(b)(1), because the JOD Defendants reside and/or work in this district.

13.     Specifically, two of the Defendants are located in Travis County, Texas, part of the Austin Division of the Western District of Texas; and the remaining Defendant is employed by a company in Travis County.

## IV.  CONDITIONS PRECEDENT

14.     All conditions precedent to this action have been performed, have occurred, or have been waived.

## V. STATEMENT OF FACTS

### A. Done For You's Program & Promises

15.     Done For You by Just One Dime ("JOD") is a group of companies led by Travis S. "Seth" Kniep that pitches itself as a "turnkey service" which "turns your investment into a full-blown business on Amazon which we manage end-to-end, making it a passive investment for you."[1]



---

[1] *See* Exhibit 1, Power Point Presentations.

16.     Mr. Kniep makes it clear in recruitment videos that JOD does not provide coaching or training for its clients, as all work is done by JOD.  JOD further pledges that it launches "only high ticket products with strong margins," and that "[i]nstead of going for high sales velocity at razor thin margins, we sell products with huge profit chunks per sale."[2]

17.     JOD advertises that it has its own Chinese staff on salary at a warehouse in China, which gives it a huge leg up on the competition.

18.     JOD claims it is highly selective in choosing its investors, and that it goes through the motions of screening prospective investors.

19.     In truth, JOD accepts anyone and everyone who will pay its initiation fees.  This results in many of its investors competing against each other for sales of essentially the same products.

20.     In a cash flow example using a product that sells for $100, JOD asserts that $60 goes to costs (including $15 to Just One Dime) and the remaining $40 goes to the seller.[3]

21.     Sadly, what Mr. Oakes has learned after sinking thousands of dollars into the JOD program is that it does *not*, in fact, provide turnkey service, it does

---

[2] *Id.*
[3] *See* Exhibit 2, email "You're booked! — read this before your meeting"

*not* provide high-ticket items, and it does *not* provide anything approaching a 40% cut to the seller.

22.     JOD promises that investors will eventually be able to resell their JOD businesses for at least 50 times their original investments.[4]  In the JOD promotional video "Amazon Automation—FBA Business Run for You!", Seth Kniep stated that a conservative return on investment within 12 months is 200%.[5]

23.     Interestingly, that statement is redacted from the latest versions of the video being used by JOD.

24.     But JOD's eventual removal of this guarantee from the video does not negate the fact that numerous JOD customers, including Plaintiff Michael Oakes, relied on it to their detriment.

**B. *Plaintiff Michael Oakes***

25.     Mr. Oakes spent 24 years working in software development at two companies.  Unfortunately, when a recession hit he was laid off and found himself unable to compete with the tech industry's preference for recent college graduates.

---

[4] *See* Exhibit 3, JOD YouTube video "Amazon Automation – FBA Business Run for You" featuring Travis Kniep (Streamed live on July 31, 2020), with accompanying Transcript. Note: video exhibits will be provided to the Court via flash drive.
[5] *See* https://www.youtube.com/watch?v=r_EfpOV2VV0 at 3:58, which contains the statement.

For this reason, Mr. Oakes determined that he would need to rely on strong investments to ensure his financial future.  JOD appeared to be the solution he needed.

### C. JOD Services Agreement

26.    On July 18, 2020, Plaintiff Michael Oakes entered into a Services Agreement with Veritus a Series of Embue, LLC ("Veritus"), in which Veritus stated it would be "building, managing, optimizing and scaling an Amazon store" for Mr. Oakes. [6]

27.    Veritus is one of the numerous trade names used by Defendant Just One Dime Coaching, LLC. "Exhibit A" of the Services Agreement ("the Agreement") contains a laundry list of services JOD (referred to in the Agreement as "The Company") promised to supply for Mr. Oakes ("the Client"):[7]

28.    These services included finding unique, high quality products with favorable profit margins, applying for brand protection programs on Amazon to prevent others from "piggy-backing" on Mr. Oakes' listings; and building, testing and optimizing Amazon PPC ads on Mr. Oakes' listings to increase their rankings on the website.

---

[6] *See* Exhibit 4, Services Agreement, including exhibits A-C.
[7] *Id.*

29.     The Agreement also promised that JOD would respond to critical purchaser reviews and negative seller feedback.

30.     Exhibit C of the Agreement[8] includes a rundown of financial responsibilities and payouts assigned to Veritus and to Mr. Oakes, respectively. Exhibit C provides:

> Company is providing the service of building and managing the store.
>
> Client is paying for all business costs including, but not limited to manufacturing, shipping, customs & duties, photography, product videos, PPC, Amazon FBA fees, etc.
>
> FBA fees, the monthly Amazon professional account fee, and PPC fees will be paid to Amazon by the Client directly.
>
> All other expenses will be paid by Client to the Company and then Company will pay the vendor directly. This can include but is not limited to the photographer, supplier, social media platform building, keyword and SEO optimization off the Amazon platform, or any other third party who provides a service to help grow the store. The Company will invoice the Client, payable within 7 days of sending the invoice. The Client will pay the Company for its services as follows:[9]
>
> - $40,000 for building the Amazon store and launching 4 product(s) on Amazon including all the services in Exhibit A.
>
> - 15% gross revenue to Company. Company will manage all bookkeeping and financials and send an invoice to Client quarterly along with a profit and loss statement payable within 7 days of sending the invoice.

---

[8] *Id.*

[9] *Id.*

- $3,650 annual fee for account maintenance of Amazon store.

- $10,000 per product for any additional product launches.

31.     Of course, if there are never any profits, it is completely irrelevant whether Mr. Oakes was to pay 0%, 5%, 10%, 15%, or 30% of $0 profit.

32.     On July 23, 2020, Mr. Oakes wired his initial payment of $40,000 ($10,000 per product), followed by a second wired payment on August 25, 2020 of $10,000 to Veritus for a fifth product.[10]

33.     The initial fee of $10,000 per product is a "development fee" that goes entirely to JOD's "overhead" costs, so Mr. Oakes needed to raise $50,000 *plus* the costs of the products themselves, shipping fees, trademark registration costs, and various other expenses for which Mr. Oakes was responsible under the Agreement.

34.     Based on the investment plan JOD presented to him, Mr. Oakes believed he had found a reliable way to greatly supplement his retirement income. Therefore, Mr. Oakes liquidated a retirement fund to finance his investment with JOD.[11]  Since the withdrawal constituted a premature distribution of funds, Mr. Oakes knew he would be paying considerable tax and early distribution penalties. Considering the income JOD led him to expect, it seemed like a reasonable tradeoff.

---

[10] *See* Exhibit 5, Receipt for Wire Transaction.
[11] *See* Exhibit 6, 401(k) Withdrawal Statement (redacted).

35.     After some pressure from potential JOD investors and a negative online review from YouTuber Coffeezilla (in a video entitled "Just One Scam"),[12] JOD offered an Addendum to the original Agreement.

36.     On September 18, 2020, Mr. Oakes and Mr. Kniep (on behalf of Veritus) signed the Addendum to Services Agreement. The Addendum provides:[13]

> A percentage of gross sales revenue is payable to Company on a sliding scale.  Company will send an invoice to Client every 3 months, payable within 7 days of sending the invoice, based on the following profit margins:
>
> - 0% to 9.99% margin – Veritus receives nothing
> - 10% to 19.99% margin – Veritus receives 5% sales revenue
> - 20% to 29.99% margin -Veritus receives 10% sales revenue
> - 30% and above margin -Veritus receives 15% sales revenue
> - Revenue share is capped at 15% sales revenue

### D. Broken Promises

37.     As Mr. Kniep promised in his promotional videos, JOD assigned Mr. Oakes a "brand builder," Danilo Varriale ("Mr. Varriale"), a professed expert who was to create, update, and monitor Plaintiff's Amazon store and meet with Mr. Oakes for an hour each week via Slack to keep him informed about his store's progress and answer any questions he had.

---

[12] *See* Exhibit 7, video, found at https://www.youtube.com/watch?v=r_EfpOV2VV0 at 6:00-11:00.
[13] *See* Exhibit 8, Addendum to Services Agreement.

38.     However, as JOD signed up a growing number of sellers, Mr. Varriale had little time to communicate with Mr. Oakes.

39.     On August 31, 2020, Mr. Varriale informed Mr. Oakes via Slack message that he would no longer be available for weekly meetings.[14]

40.     Thereafter, Mr. Oakes received very little information on the progress of his Amazon store.  To obtain the sales information he needed, Mr. Oakes turned to studying Amazon Seller Central—the system for monitoring a store's sales activity and financial status—on his own.  JOD, which billed itself as a "turnkey" operation, did not provide Plaintiff with a single financial status report.

41.     To date, JOD has supplied Mr. Oakes with four of his five requested products to sell on Amazon: a wine cart, a document camera, a whiteboard, and a wine cellar.  The fifth product was to be a laser engraver.  There were numerous production delays with the engraver.

42.     On March 22, 2021, Erica from JOD messaged Mr. Oakes that JOD was evaluating three different models and were close to a final decision.[15]

---

[14] *See* Exhibit 9, JOD Slack Communication of 8/31/20.
[15] *See* Exhibit 10, Slack communications.

43.     On July 19, 2021, Erica messaged Mr. Oakes that the engraver had been put into a queue by the manufacturer, and it would begin production in the coming weeks.[16]

44.     On October 18, 2021, Erica notified Mr. Oakes that power outages in China were affecting the production of the engravers.

45.     Mr. Oakes  inquired about the laser engraver on January 12, 2022, and Mr. Varriale responded on January 18, 2022, "Laser Engraving Machine, we had completed development A LONG time ago. We decided to postpone production as numbers were no longer making sense.  I am referring to purchasing price and selling price on Amazon."[17]   Mr. Varriale went on to say that JOD would look for better pricing, but that if the search was unsuccessful, JOD would look for an alternative product.[18]  Mr. Varriale ensured Mr. Oakes that the "sourcing Team" was "working on this now."[19]

46.     Mr. Oakes still has not received his fifth product.  Nor has he received a refund of his $10,000 "development fee" he paid for a fifth product.

---

[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

47.     None of these products has proven to be the type of high-quality product with high profit margins promised by JOD. Despite JOD's claimed expertise in Internet sales, it failed to foresee and prepare for the increased costs of manufacturing, shipping products from China, and PPC during the Covid pandemic.  Thus, while Amazon had record sales during the Covid crisis, Mr. Oakes experienced heavy losses.  The JOD products were in high competition (i.e., narrow profit margins at best) and, in fact, to even reach consumers (as they were overpriced), Mr. Oakes was billed by Amazon for PPC advertising expenditures set and managed by JOD.

48.     Not only did JOD provide Mr. Oakes with products with heavy online competition (often even from other JOD investors!), but also, these products were poorly packaged, resulting in numerous returns and replacements.  Thus, Mr. Oakes was saddled with the added expense of items that were returned to Amazon by the buyers.

49.     At least two of Mr. Oakes' products, the wine cellar and the camera, had incredibly high return rates.

50.     Instead of the strong profit margins it promised, JOD (at best) provided exactly the razor thin margins it claims not to.  JOD controls the sales prices of its

investors' products, so sellers like Mr. Oakes have no choice but to sell their products at JOD's prices.

51.     As JOD continued to string him along, Mr. Oakes dutifully kept his end of the bargain, believing that if he kept investing money, he would eventually turn a profit.  Unfortunately, Mr. Oakes lost money with every sale.

52.     Finally, on October 13, 2022, Defendant Seth Kniep announced during the monthly JOD Done for You investor meeting that he is closing the Done for You program with which Mr. Oakes contracted, and that JOD will *not* be offering any refunds to participants.  Thus, Mr. Oakes has invested money that he has no hope of recovering.

### E.  Example of Economic Disaster—Whiteboards

53.     It is JOD's policy not to disclose to investor clients the wholesale costs of the products the clients are assigned to sell in their Amazon stores.  Clients are not even told the names of the Chinese manufacturers who produce those products.  JOD is the middleman between the manufacturers and the clients. By keeping the clients in the dark about pricing, JOD, theoretically, can arrange to buy directly from the manufacturer at a low price and then profit by selling to clients like Mr. Oakes at a higher price.  JOD then controls the prices its clients

charge on Amazon.  It theoretically gets 15% of whatever profit the clients make. However, it is most often the clients who lose.

54.     The Whiteboard JOD selected for Mr. Oakes' Amazon store is just one example of the no-win situation in which JOD placed Mr. Oakes. While JOD promotes that it finds its clients unique products that carry a high profit margin, Mr. Oakes learned by doing his own research that the whiteboard he was selling was also being sold by other JOD clients.[20]

55.     In addition, JOD required that Mr. Oakes pay for photographs of his whiteboard to be posted on his Amazon site, so he assumed the photographs he paid for would be exclusive to his own store.  He learned this was not the case. Mr. Oakes has found the photograph of his whiteboard in other locations online, including on the manufacturer's website.[21]  Not only that, but also, visible in the whiteboard photograph on the manufacturer's (Hangzhou Vicrownwit Technology Co.) site, is the actual trademarked logo of Mr. Oakes' Amazon shop, OcnBlu.[22] Mr. Oakes received no compensation for the use of his photographs or his logo.

---

[20] *See* Exhibit 11, Table of Whiteboard Sellers.
[21] *See* Exhibit 12, China Manufacturing Listings with photos.
[22] *Id.*



## F. Intimidation Factor

56.     The following are a few of the high-pressure tactics that Mr. Oakes experienced from JOD:

- After Mr. Oakes obtained counsel to assist him and a DTPA demand letter was sent, JOD sent Mr. Oakes an invoice for $993.66 for "pickup, sorting, and handling" of wine carts and document scanner.[23] "Bianca" from JOD sent Mr. Oakes a message via Slack that the invoice had been sent. Mr. Oakes responded to the message by forcefully declaring he did not owe JOD anything. When "Em" from JOD messaged Mr. Oakes that JOD was

---

[23] *See* Exhibit 13, JOD Invoice No. 3390, dated 5/13/22, and Exhibit 14, JOD Slack Communication of 5/13/22 and 5/16/22.

reviewing his concerns, he cited an earlier email he had received from Ace Capistrano of JOD, stating his account had a zero balance.[24] Mr. Oakes responded by referring Em to an email he'd received from JOD's Ace Capistrano indicating that Mr. Oakes' account was up to date.[25]

- Whenever Mr. Oakes asked for JOD's assistance or questioned the company's tactics, he was met with denial and rejection. During one video call with Defendant Mr. Kniep, Mr. Oakes requested a full refund on the wine cart JOD provided due to poor quality control on the company's part. JOD refused to even consider the request.

- In response to increasing complaints from investors, JOD drew up an Online Arbitrage and Private Label Cancellation Contract,[26] which is one-sided in JOD's favor and would gut Mr. Oakes' ability to seek consumer protection relief. Despite repeated attempts by JOD to convince Mr. Oakes to sign the document, he has refused to sign it.

---

[24] *Id.*
[25] *Id.*
[26] *See* Exhibit 15, Online Arbitrage Agreement.

## G.  The Disappearing Investment

57.     Finally, on October 13, 2022, during a monthly JOD investor meeting, Defendant Kniep announced to investors that he would be closing the "Done for You" program and will NOT be offering refunds to those who had already paid into it.

58.     Mr. Oakes did not have access to that meeting, as he is no longer considered an "active" JOD investor.

59.     Mr. Kniep has also publicly announced layoffs of JOD staff.

60.     Understandably, this has caused Mr. Oakes a great deal of concern about his ability to regain from JOD the funds needed to secure his retirement.

## VI.  CAUSES OF ACTION

### COUNT 1 – Failure to Register Securities Under the Securities Act of 1933

61.     The Plaintiff incorporates the preceding paragraphs as if repeated fully herein.

62.     Plaintiff alleges that contract into which he and Defendants entered is an unregistered security, and as such it violates the Securities Act of 1933, as amended (the "Securities Act").  The Securities Act broadly defines securities "to

include a long list of financial instruments, including 'investment contracts.'" *SEC*

*v. Arcturus Corp.,* 928 F.3d 400, 409 (5th Cir. 2019).   To be classified as a security, an

investment contract must meet three requirements:  "'(1) an investment of money;

(2) in a common enterprise; (3) with profits derived from the efforts of others.'" *Id.,*

(citing *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298-99, 66 S.Ct. 1100, 90 L.Ed. 1244

(1946); and quoting *Williamson v. Tucker,* 645 F.2d 404, 417-18 (5th Cir. 1981)).

63.     Plaintiff maintains that the Services Agreement is an investment

contract that constitutes a security. The transactions between Plaintiff and

Defendants satisfy the three requirements enunciated by the Supreme Court in

*Howey* and followed in *Arcturus.*   First, Mr. Oakes initially paid JOD $50,000 with

the understanding that JOD would do all the work to set up Mr. Oakes' Amazon

store. In fact, Defendants repeatedly informed Mr. Oakes that this arrangement

did not constitute a training course or a mentorship in online selling; that JOD

would be doing everything.[27]  Secondly, the common enterprise agreed upon was

to sell merchandise on the Amazon website.  Thirdly, Mr. Oakes' profits were to

be derived from the efforts of others (i.e., Defendants).  When evaluating whether

an investment was made with an expectation of profits from the efforts of others,

---

[27] *See* Exhibit 16, https://www.youtube.com/watch?v=5aIIFqCW2ec&t=20s at 24:00, wherein Mr. Kniep states "You will learn a ton because you're going to have a front row seat to everything.  But this is not training or a mentorship as that is much more time intensive.  So that would require a different pay structure."

Texas courts ask whether the efforts made by others are "those essential managerial efforts which affect the failure or success of the enterprise." *Pinter, supra,* at 73 (quoting *Searsy v. Com. Trading Corp.,* 560 S.W.2d 637, 638 (Tex. 1977).

64.    Defendants sold units in JOD to Plaintiff without first properly registering them as securities as required by the Securities Act.

65.    "The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities." *Swenson v. Engelstad,* 626 F.2d 421, 424 (5th Cir. 1980). Specifically, Section 5 of the Securities Act provides that unless "a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly. . . to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security. . ." 15 U.S.C. § 7e(a). Section 12 of the Securities Act creates civil liability for sellers violating Section 5:

> Any person who . . . offers or sells a security in violation of section 77e of this title . . . shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
>
> 15 U.S.C. §77l(a).

66.    To make a prima facie case for the unlawful sale of an unregistered security, a plaintiff must show "(1) the sale [of] or offer to sell securities; (2) the absence of a registration statement covering the securities; and (3) the use of the mails or facilities of interstate commerce in connection with the sale or offer." *Engelstad*, 626 F.2d at 425.  Plaintiff contends he satisfies that test.  First, it is clear from the Services Agreement that Defendants offered and sold units in JOD. Secondly, the units Defendants sold were not properly registered as securities. Third, Defendants used online networking platforms to solicit and communicate with potential investors.  *See SEC v. Carter,* No. 4:19-CV-100SDJ, 2020 U.S. Dist. LEXIS 200391 at *4 (E.D. Tex. 2020) (concluding that communicating with potential investors through email, obtaining investment from at least one out-of-state investor, and obtaining funds from investors through wire transfer constituted offering and selling securities through interstate commerce.

67.    For Section 12 violations, the Securities Act provides a remedy of money damages that equates to a recission of the contract.  Specifically, Plaintiff can recover "the consideration paid for [the] security with interest thereon, less the amount of any income received thereon."  15 U.S.C. §77l(a).

**COUNT 2 –** *Failure to register Securities Under the Texas Securities Act*

68.     All preceding paragraphs and allegations are repeated and incorpo-

rated herein by reference.

69.     Plaintiff Oakes also seeks damages under the Texas Securities Act

("TSA").  Under the TSA, a "dealer or agent may not sell or offer for sale any

securities . . . unless the commissioner has issued a permit qualifying securities

for sale for those securities to the issuer of the securities or a registered dealer."

TEX. GOV'T CODE §4003.001.  A plaintiff may sue a person who offers or sells a

security in violation of the registration requirements for recission of the sale.  *Id.;*

§4008.051.  A plaintiff entitled to recission may "recover the consideration . . . paid

for the security plus interest on the consideration at the legal rate from the date

the buyer made the payment, less the amount of any income the buyer received

on the security."  *Id.* §4008.05(a).

70.     The definition of "security" under the Texas Securities Act ("TSA")

includes investment contracts.  The Texas Supreme Court has adopted a test to

determine when investment contracts are securities under the TSA.   In *Life

Partners, Inc. v. Arnold,* 464 S.W.3d 660, 670 (Tex. 2015), the court found that an

"investment contract" for purposes of the Texas Securities Act means "(1) a

contract, transaction, or scheme through which a person pays money (2) to

participate in a common venture or enterprise (3) with the expectation of receiving profits, (4) under circumstances in which the failure or success of the enterprise, and thus the person's realization of the expected profits, is at least predominately due to the entrepreneurial or managerial, rather than merely ministerial or clerical, efforts of others, regardless of whether those efforts are made before or after the transaction." *Arnold, supra,* at 667.

71.     Plaintiff contends the JOD Services Agreement fits this definition of an investment contract.  To qualify as an investment contract security, "the transaction must be such that, in reality, the seller or another party other than the purchaser, exercises the predominant managerial or entrepreneurial control on which the purchaser's anticipation of profits is based." *Arnold* at 674-75.

72.     The Texas Securities Commissioner has not issued a permit qualifying the JOD Services Agreement as a security in Texas or registered any of the JOD Defendants to sell securities.[28]

73.     Accordingly, Defendants are liable to Plaintiff for recission under the Texas Securities Act.  Upon recission, Plaintiff is entitled to recover the consideration he paid for the JOD contract plus interest thereon at the legal rate

---

[28] *See* Exhibit 17, Certificates of the Texas Securities Commissioner affirming that JOD, Mr. Kniep, and Mr. Varriale were not registered with the State of Texas to sell securities, and that the JOD Services Agreements were not registered securities.

from the date of payment by him, less the amount of any income he received on the security, upon tender of the security.

**COUNT 3 – *Breach of Contract***

74.    Plaintiff Oakes incorporates the preceding paragraphs as if repeated fully here.

75.    The parties in this matter entered into a valid contract, i.e., the Services Agreement.

76.    Plaintiff performed all of his obligations under the contract.

77.    Defendants materially breached the contract by failing to complete most of their obligations under the contract, including JOD's promise to provide a weekly meeting with Mr. Varriale, and JOD's obligation to provide a fifth product for Mr. Oakes to sell.

78.    Defendants materially breached the contract by failing to assign him a fifth product to sell, although he had paid the $10,000 development fee to reserve a fifth product.

79.    Defendants materially breached the contract by failing to assign him quality products with high profit margins.

80.     As a result of Defendants' material breach of the contract, Plaintiff has

suffered damages.

### COUNT 4 - *Violations of the Texas Deceptive Trade Practices – Consumer Protection Act (TEX. BUS. & COM. CODE §17.46 ET SEQ.)*

81.     Defendants engaged in an unconscionable action or course of action

that, to Plaintiff's detriment, took advantage of his lack of knowledge, ability,

experience, or capacity to a grossly unfair degree.  Specifically, Defendants lured

Mr. Oakes into what they knew was an unfavorable business arrangement for him

by taking unfair advantage of the fact that Defendants have far more knowledge

about Amazon sales than he does.

82.     Defendants falsely represented that they would  set up for Plaintiff a

"full blown business" on Amazon, which they would "manage end-to-end,"

making it a "passive investment" for Mr. Oakes.  In actuality, Defendants took Mr.

Oakes' money and failed to follow through on their claims that they would

provide "turnkey service."  Mr. Oakes' initial investment of $50,000 went to pay

Defendants and their staff, but in the end Defendants failed to provide the support

and services that were promised.  Mr. Oakes has had to bear the losses.

83.     Defendants fraudulently employed a "bait and switch" technique,

promising a better-quality product, more marketable than the items they actually

provided. Defendants drew in Plaintiff by falsely advertising that it deals in "high ticket" products with large profit margins, when they ultimately offered highly competitive products on which Mr. Oakes has taken a considerable loss. Defendants' fraudulent intent is demonstrated by evidence such as a video presentation in which Defendant Kniep personally explains to potential investors how they can avoid liability by setting up shell companies.[29]

84.     Plaintiff has suffered economic damages from Defendants' deceptive and fraudulent behavior, and he is entitled to treble damages and attorney fees and costs under TEX. BUS. & COM. CODE §17.50.

**COUNT 5 – *Unjust Enrichment***

85.     Plaintiff Oakes incorporates the preceding paragraphs as if repeated fully here.

86.     Unjust enrichment is not a distinct independent cause of action, but rather a theory of recovery.  *Mowbray v. Avery*, 76 S.W.3d 663, 679 (Tex. App.—Corpus Christi 2002, pet. denied).   A party may recover under an unjust enrichment theory where a person has obtained a benefit from another due to fraud, duress, or taking of undue advantage.  *Id*.

---

[29] *See* Exhibit 18, YouTube Video of Travis Kniep at time stamp 37:20.

87.     If Plaintiff does not prevail in his claim for legal remedies such as his breach of contract claim or his deceptive trade practices claim, defendant will lack a suitable remedy at law.

88.     Defendants' conduct in accepting Plaintiff's investment without carrying out its duties under the Services Agreement constitutes more than unfair conduct; Defendants profited from their own fraudulent claims and took undue advantage of Plaintiff.  Thus, Plaintiff seeks damages in unjust enrichment as an alternative remedy.

## VII.  JURY DEMAND

89.     Plaintiff Michael Oakes asserts his rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## VIII.  PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment as follows:

     a.  Actual and economic damages including liquidated and unliquidated damages;

     b.  Punitive damages;

     c.  Treble damages, where appropriate;

    d.  Pre-judgment and post-judgment interest at the maximum rate allowed by applicable law;

    e.  Pre-judgment and post-judgment interest at the maximum rate allowed by applicable law from the date of judgment until paid in full;

    f.  Court costs;

    g.  Attorney fees; and

    h.  All other relief, special or general, legal or equitable, as Plaintiff may be shown to be justly entitled to receive.

Respectfully submitted on this __14th__ day of October, 2022.

/s/ Rain Levy Minns Udall
_____
Rain Levy Minns Udall
State Bar No. 24034581
Minns Law Firm, P.C.
d/b/a Rain Minns Law Firm
4412 Spicewood Springs Rd., Suite 500
Austin, Texas 78759-8583
Tel.: 512-372-3222
Fax: 512-861-2403
rain@rainminnslaw.com

ATTORNEY IN CHARGE FOR
PLAINTIFF MICHAEL OAKES